**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MANUEL FERNANDEZ<br><br>Defendant. | Criminal Action No. 12-835 (JLL)<br><br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of Defendant's motion to suppress (1) all evidence seized pursuant to a search warrant executed on January 25, 2012; and (2) Defendant's statements to law enforcement on the day of the search. The Court has considered the submissions made in support of and in opposition to Defendant's motions, as well as the arguments and evidence presented on the record during the evidentiary hearing held in connection with the motion to suppress the Defendant's statements and the oral argument on the motion to suppress the evidence seized pursuant to the search warrant. For the reasons set forth below, Defendant's motion is DENIED.

## I.    FACTUAL BACKGROUND

On January 23, 2012, Magistrate Judge Cathy Waldor approved an application for a search warrant by Homeland Security Investigations ("HSI") Special Agent David M. Fallon. (*See* Def. Exhibit A.) Special Agent Fallon applied for a warrant authorizing a search at 103 Ryerson Avenue in Wayne, New Jersey for "evidence, fruits, and instrumentalities relating to

1

violations of Title 18, United States Code, Sections 2251, 2252(a), 2252A, and 2, which make it

a crime to receive, possess, or distribute, or aid and abet the receipt or distribution of, child

pornography." (Id., Attachment B at 1.)  Special Agent Fallon signed an affidavit in support of

the warrant setting forth the facts establishing probable cause.  (Id., Attachment C, at 18.)

Among other evidence, the warrant authorized the seizure of:

> (1) Any and all computer(s), computer hardware, computer software, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to: (a) visually depict child pornography or child erotica; (b) display or access information pertaining to a sexual interest in child pornography; (c) display or access information pertaining to sexual activity with children; or (d) distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica.
>
> (2) Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs, including, but not limited to, peer-to-peer software (which refers to software used to access a network in which participating computers can share files with one another directly, without requiring the use of an intermediary server.  Users access these networks through software that allows users to search for and share files across the network).

(Id.)  The warrant also authorized law enforcement to "search, copy, image and seize" certain

electronic media for "offsite review."  (Id., Attachment B at 5.)  Special Agent Fallon explained,

for example, that:

> [t]he search of computer systems is a highly technical process that requires specialized equipment and specific expertise. Computer users can attempt to conceal data within computers and storage devices through a variety of methods, e.g., by changing the three-letter file extension to make it appear as though an image file is really a text file. Accordingly, computer analysts need the ability to seize all of a computer's input and output peripheral devices, related software, and security devices, so that the computer experts can accurately and carefully retrieve all of the relevant data.

(Gov't. Opp. 3; Def. Exhibit A, Attachment C, at 23-24.)  He also set forth the reasons why such a search could take a significant amount of time, "weeks or months, depending on the volume of data stored" to complete.  (Id., at 25.)

The Report of Investigation of the Department of Homeland Security states that HSI agents executed the search at 103 Ryerson Avenue on January 25, 2012 at approximately 6:00am.  (Id., Exhibit C, at 3.)  Special Agent Fallon led the search team, which included a translator, Special Agent Shirley Vasquez.  (See Tr. 18:21-23, 35:2-4.)  The team believed there would be Spanish-speaking residents present at the location of the search and that a translator might be necessary.  (Tr. 22: 8-12.)

At the evidentiary hearing, Special Agent Vasquez testified first.  She testified that she could not recall whether she gave a set of knock-and-announce warnings in Spanish before the team entered the residence.  (Tr. 23:3-9.)  She testified that she waited outside while the other agents knocked and announced their presence.  (Tr. 29:1-30:9.)  Special Agent Vasquez stated that she subsequently entered the residence at 103 Ryerson Avenue around 6:30am.  (Tr. 19:19.)  When she entered the residence, she observed the Defendant reading the search warrant in the kitchen area.  (Tr. 19:23-20:1; 26:9-12.)  She asked the Defendant if he needed her to translate the warrant; he said he did not because "he ran his own business, and he basically conducted his business in English."  (Tr. 20:2-7.)  Special Agent Vasquez testified that this was the last and only interaction she had with the Defendant.  (Tr. 21:5-8.)

Special Agent Fallon testified next.  He explained that he was part of the entry team for the January 25, 2012 search with his partner, Special Agent Kret, and Special Agent Vasquez.  (Tr. 35:22-36:5.)  He testified that in addition to Special Agent Vasquez acting as translator, the team for the search included an entry team, cover team, photographer, interview team, and

3

forensic agent.  (*See* Tr. 35-38.)  Special Agent Fallon explained that it was his belief as a result of surveillance and the investigation that a translator might be needed.  (Tr. 38:17-23.)

Special Agent Fallon then explained what happened on the day of the search.  He testified that he approached the door of the residence and knocked and announced the agents' presence and the existence of a search warrant.  (Tr. 39:10-12.)  When there was no answer, he knocked and announced again.  (Tr. 39:13-14.)  He testified, in contrast to Special Agent Vasquez's account, that after this second attempt, Special Agent Vasquez went up to the door and knocked and announced their presence and the existence of a warrant in Spanish.  (Tr. 39:13-16.)  After the third knock-and-announce, the Defendant answered the door and appeared "groggy at best from just waking up."  (Tr. 40:4-5, 13-1; 63:8-11.)  Shortly after the agents went inside, the Defendant asked in English if he could see a copy of the warrant, and Special Agent Fallon handed it to him.  (Tr. 40:22-24; 40:25-41:2.)  The Defendant was escorted to the kitchen while reading the warrant.  (Tr. 60:18-23.)  Special Agent Fallon observed that the Defendant "became distraught, nervous in [his] opinion, so [he] asked him" if he knew why they were there.  (Tr. 41:11-14.)  The Defendant replied in English, "Yes, you are here for me."  (Tr. 41:15-18.)  Special Agent Fallon then stopped him from making any more statements, and told him he needed to read him his rights before he could continue talking.  (Tr. 41:19-23.)  The Defendant was then escorted to the kitchen, where he remained until Special Agent Fallon had checked in on the progress of the search elsewhere in the residence.  (Tr. 41:25-42:15.)  Agent Fallon returned to the Defendant and told him that he "would like to speak to him, but…that a private location would probably be best."  (Tr. 42:21-22.)  The Defendant responded in English that "he would be okay with the basement."  (Tr. 43: 9-11.)

After Special Agents Fallon and Kret sat down in the basement with the Defendant, Special Agent Fallon read the Defendant his *Miranda* rights in English. (Tr. 43:22-44:1.) Special Agent Fallon then "offered him the Spanish or English form of his rights," and the Defendant chose the English waiver form. (Tr. 44:2-5.) Agent Fallon handed him the form and asked the Defendant to read it. (Tr. 48:16-20.) The Defendant read the form to himself, (Tr. 48:23), and signed it. (Tr. 45:22-25; Gov. Exhibit G1.) Special Agent Fallon told the Defendant that "if [he] wish[ed] to continue talking, it was required that he sign it." (Tr. 48:24-49:2.) Special Agents Fallon and Kret then questioned the Defendant for approximately 40 minutes, until the Defendant stated that he had gastrointestinal issues and needed to use the restroom. (Tr. 49:9-20.) An agent escorted the Defendant, and left the door ajar while the Defendant was in the restroom, in compliance with standard operating procedure. (Tr. 50:3-22.) When the Defendant returned to the basement, Special Agent Fallon reminded him of his Miranda rights in English. (Tr. 50:25-51:7.) The Defendant stated that he wished to continue talking, and the interview continued for approximately 30 minutes longer. (Tr. 51:8-11; 70:11.) During the interview, the Defendant admitted to having possessed child pornography. (Def. Exhibit C, at 5-7.)

On the day of the search, the agents were wearing bullet proof vests and jackets that said "ICE Police." (Tr. 52:16-53:10.) Special Agent Fallon was carrying a handgun in its holster. (Tr. 53:11-15.) Neither Special Agent Fallon nor any of the other agents present drew their weapons during the search. (Tr. 51:15-22.) Special Agent Fallon could not recall if he or his team used flashlights during the search or interview. (Tr. 76:1-10.)

On cross-examination, Agent Fallon stated that he observed the Defendant speak and respond to English, but admitted that at no point did he hear the Defendant read an English

document out loud. (*See* Tr. 67:6-10.) He testified that Special Agent Vasquez informed him of the Defendant's ability to understand English, but that he was the first one to come into contact with the Defendant, and handed him an English copy of the warrant. (Tr. 67:11-24.) Agent Fallon testified that he had no way of knowing whether the Defendant understood the words on the *Miranda* waiver form or on the warrant, and that he learned during the interview that the Defendant was illegally in the United States, the he was from Costa Rica, and that his native language was Spanish. (Tr. 67:25-69:1.)

At the conclusion of the interview, Special Agent Fallon arrested the Defendant for the possession of child pornography, and the Defendant was issued an immigration detainer. (Def. Exhibit C, at 8-9.)

Special Agent Michelle Chase was the computer forensic agent present during the search. (Tr. 88:21-22.) Special Agent Chase testified that she seized the following items from the residence: Compaq tower computers, an iPad, three iMac computers, a couple external hard drives, another [computer] tower, and an iTouch." (Tr. 89:19-20.) Special Agent Chase imaged the contents of the hard drives "bit by bit" at the lab in order to analyze their contents. (Tr. 90:3-18; 104:9-13.)

After the search, the Defendant was processed for immigration purposes by an HSI Special Agent in the Cyber Crimes unit. The Government called Special Agent George Doyle, who testified that he was the agent in charge of processing the Defendant on January 25, 2012, after the Defendant had been arrested. (*See, e.g.,* Tr. 131-33.) Special Agent Doyle explained that his responsibility with respect to immigration matters was to "process aliens for removal proceedings." (Tr. 130:25-131:1-3.) Agent Doyle testified that "[f]rom the moment they are arrested, we go ahead and process them, and we put them into our databases, fingerprint them[,]

6

and prepare certain documents that would go to immigration court." (Tr. 131:5-8.)  As part of

this process, aliens are provided with a Notice of Rights and Request for Disposition.  (Tr.

131:9-24.)  This form "advise[s] aliens [of] their rights…under the Immigration and Nationality

Act."  Special Agent Doyle has given out "at least a hundred" such forms in his career.  (Tr.

131:25-132:2.)  He explained that the Defendant in the instant matter was given, and signed, a

Notice of Rights form.  (*See* Tr. 132:19-133:18.)  Specifically, at 10:54 a.m. on January 25,

2012, Agent Doyle "served Mr. Fernandez with this document."  (Tr. 134:6-10.)  He advised the

Defendant of his rights in English, and had the Defendant read the notice out loud to him in

English, as well.  (Tr. 134:22-135:11.)  There are boxes on the form to indicate both that the

notice was read aloud to the Defendant and that the Defendant read the notice out loud to the

agent.  (*See* id.; *see also* Government Ex. G6.)  Agent Doyle explained that:

> as part of [his] normal processing, when [he] encounter[s] somebody who speaks
> English, [he] need[s] to determine whether or not they need an interpreter.  So when they
> tell [him] that they understand English, [he[ tr[ies] to test that a little bit, just so that [he
> is] comfortable with them saying that because if [he is] going to check that box, "read by
> subject," I want to make sure that they can -- that they have the ability to comprehend the
> words.  So normally [he] ask[s] them to read a portion of the document to [him].  When
> [he is] satisfied, that is when [he] will tell them to stop.

(Tr. 135:13-20.)  Agent Doyle also clarified that he handwrote on the form "See above, I want to

see an immigration judge" because there was a mistake on the form: a certain box was

automatically checked.  He wanted to make sure that it was the Defendant's intention to see an

immigration judge, so he asked the Defendant to initial Agent Doyle's handwritten addition to

the form and put a line through the incorrect default selection ("I admit that I am in the United

States illegally.").  (Tr.  137:4-16.)  Agent Doyle testified that had the Defendant asked to see

the Notice of Rights form in Spanish, or told him that he only spoke Spanish, Agent Doyle

would have provided the form in Spanish and gotten an interpreter.  (Tr. 137:17-21.)

On the day of the search, the Defendant was charged by Criminal Complaint with one count of knowingly possessing child pornography, in violation of Title 18, United States Code, Section 2252A(a)(5)(B).   On December 19, 2012, a grand jury sitting in Newark, New Jersey, returned a five-count Indictment against Fernandez.  Counts One through Four charged him with distributing child pornography, in violation of Title 18, United States Code, Section 2252A(a)(2)(A), and Count Five charged him with possessing child pornography, in violation of Title 18, United States Code, Section 2252A(a)(5)(B).

On November 18, 2013, Defendant filed a motion to suppress the evidence seized from 103 Ryerson Avenue, and a motion to suppress the statements he made to agents on the day of the search.  Because Defendant supplied the Court with an affidavit that raised an issue of fact as to whether he understood the English language and was thus capable of knowingly and voluntarily waiving his *Miranda* rights, the Court held an evidentiary hearing in connection with Defendant's motion to suppress his statements on March 13, 2014.  Following the evidentiary hearing, the Court heard oral argument as to the constitutionality of the search warrant on March 19, 2014.

## II.   LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  To prevail on a motion to suppress, a defendant generally bears the burden of proving that the challenged evidence was obtained in violation of the Constitution. *See United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) ("The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated.").  However, if the defendant establishes a basis for his motion, e.g., that

8

the search or seizure was conducted without a warrant that complied with the Fourth Amendment, the burden shifts to the government to show that the evidence was constitutionally obtained. *See, e.g., United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

The Fifth Amendment provides, in part, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Court held that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. "To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the Miranda Court held, suspects interrogated while in police custody must be told that they have a right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *see also Miranda*, 384 U.S. at 479. In *Miranda*, the Court noted that "[t]he defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. "Whenever the [Government] bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our Miranda doctrine, the [Government] need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

## III.    DISCUSSION

### A.    Motion to Suppress Evidence Seized on January 25, 2012 Pursuant to the Search Warrant

#### 1.    The Warrant Was Sufficiently Particular

9

The crux of Defendant's argument challenging the validity of the warrant is that it was insufficiently particular. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.   Thus, a search warrant must limit its "authorization to search to the specific areas and things for which there is probable cause to search," *Maryland v. Garrison*, 480 U.S. 79, 84 (1987), and describe the location to be searched and items to be seized with particularity. *United States v. Yusef*, 461 F.3d 374, 393 (3d Cir. 2006). Where a defendant seeks to suppress such evidence obtained from an unreasonable search or seizure, he or she has the initial burden of proof. *See, e.g., Johnson*, 63 F.3d at 245 (internal citations omitted).

In the instant matter, Defendant argues that the search warrant was overbroad. Specifically, he maintains that the warrant was a general warrant that "effectively permitted a blanket seizure of all of the electronic records and equipment that could be found at the Ryerson Avenue residence." (Def. Br. 9.) He argues that the warrant "allowed the agents to seize all computer material and peripherals, regardless of their relationship and the relationship of the data contained therein to the illicit activity identified in the affidavit." (Id.) The Court disagrees.

In this case, the warrant explicitly confined the search of any and all computer hardware and electronic data seized to "evidence, fruits and instrumentalities relating to violations of Sections 2251, 2252(a), 2252A, and 2 of Title 18 of the United States code, which make it a crime to receive, possess, or distribute, or aid and abet the receipt or distribution of child pornography." (Def. Exhibit A, Attachment B at 1.) Notably, Defendant does not allege a lack of probable cause to search for evidence of the crime of child pornography. Instead, Defendant's argument is that the warrant allowed the agents to seize too much.

10

Defendant's position is untenable and utterly distinguishable from the primary case on which he relies: *Klitzman, Klitzman, and Gallagher v. Krut*, 744 F.2d 955 (3d Cir. 1984). In *Klitzman*, the warrant allowed the authorities to seize "existing records of an entire law practice" without tailoring the search to clients or "personnel allegedly involved in the fraudulent scheme under investigation." *Id.* at 961. Moreover, the Court expressed its concern "that the government's action…completely disregarded any concept of the attorney-client privilege." *Id.*

In contrast, the warrant authorizing the search of the Ryerson Avenue residence laid out the specific categories of items to be seized, and linked each category to the crime for which the agents had probable cause to search. (*See* Def. Exhibit A.) As the Government points out:

> [T]he affidavit in support of the search was detailed and extensive, including descriptions of: (1) P2P networking software; (2) child pornography videos downloaded on multiple occasions using P2P software from an IP address traced to Defendant's residence; (3) the ability of computer users to hide files in different areas of the computer; and (4) the need to seize and image all electronic media recovered from a search warrant, in order to be able to effectively conduct forensic examinations of the computers for evidence of child pornography. Accordingly, the items to be searched for and seized flowed directly from the probable cause set forth in the affidavit.

(Gov't. Opp. 14; *see also* Def. Exhibit A, Attachment C.) Defendant's argument that the warrant impermissibly authorized the search of all electronic data is unavailing. Warrants comply with the Fourth Amendment when they "limit[] the authorization to search to the specific areas and things for which there is probable cause to search." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The warrant at issue did just that.

Moreover, Courts have held that it is unrealistic to place significant ex ante restrictions on the search for electronic data, since "[w]hile file or directory names may sometimes alert one to the contents…, illegal activity may not be advertised even in the privacy of one's personal computer—it could well be coded or otherwise disguised." *United States v. Burgess*, 576 F.3d 1078, 1093 (10th Cir. 2009); *see also United States v. Mann*, 592 F.3d 779, 782 (7th Cir. 2011)

11

(computer filed may be "manipulated to hide their true contents"); *United States v. Richards*, 659 F.3d 527, 538-39 (6th Cir. 2011) (explaining that "the majority of federal courts have eschewed the use of a specific search protocol and, instead, have employed the Fourth Amendment's bedrock principle of reasonableness on a case-by-case basis"). The Court finds that the warrant in the instant matter was sufficiently particular in that it tailored the categories of items and places to be searched to the crime for which there was probable cause, and reasonably allowed the search of electronic data for evidence of child pornography.

2.       The Search Complied with the Warrant and the Fourth Amendment

Having determined that the warrant complied with the Fourth Amendment, the Court now turns to consider whether the search did, as well. Defendant argues that the search was overbroad because it "was not limited to and indeed far exceeded the description of the items to be seized in the search warrant." (Def. Br. 11.) Defendant claims that the agents "blanketly seized, without any particularization, a host of information, including but not limited to checks and invoices for [the Defendant's] landscaping business and his clients thereof, together with countless computer hard drives, equipment and the like containing files and records unrelated to alleged child pornography." (Id. at 11.)

In *United States v. Stabile*, 633 F.3d 219 (3d Cir. 2011), the Third Circuit upheld the search of a folder with a name unrelated to the crime for which agents had probable cause to search because "criminals can easily alter file names and file extensions to conceal contraband." *Stabile*, 633 F.3d at 239. The detective in *Stabile* ensured compliance with the warrant by creating a copy of the hard drive in order to preserve the original, searching for copied file signatures, and examining suspicious folders. *Id.*; *see also* Gov't. Opp. at 13.

12

Special Agent Michelle Chase followed these same procedures here. She made a copy of the electronic evidence seized from the Ryerson Avenue residence, conducted a preliminary search to determine which devices contained evidence of child pornography, and searched more extensively only the devices she had determined contained such evidence. (*See* Def. Exhibit D.)

The warrant authorized agents to seize, among other things: "Any and all computers and computer hardware . . . that may be, or are used to: (a) visually depict child pornography or child erotica; (b) display or access information pertaining to a sexual interest in child pornography; (c) display or access information pertaining to sexual activity with children; or (d) distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica." Pursuant to this authority, agents seized three computer towers, 1 Apple iPad, 2 loose hard drives, 1 Apple iTouch, and 3 Apple iMacs. (Def. Exhibit D.) Moreover, the warrant allowed the agents to seize "notes, documents, records, or correspondence...concerning the occupancy or ownership of the subject premises...[and] concerning ownership or use of computer equipment found in the subject premises...." (Def. Exhibit 1, Attachment B at 3.) Defendant has not pointed to a single piece of evidence seized that did not fall within the confines of the warrant, and has not demonstrated any way in which the search conducted was overbroad.

Likewise, Defendant's argument that "the government failed to follow the protocols set forth in the warrant for the seizure of electronic information, which mandated that a search of the materials be conducted by February 7, 2013" is unavailing. (Def. Br. 15.) Search warrants issued by federal courts are to be executed within fourteen days. Fed. R. Crim. P. 41(e)(2)(A)(i). However, Rule 41(e)(2)(B) authorizes "the later review" of electronically stored information unless otherwise specified in the warrant. The comments to the Rule explain that "[a] substantial

13

amount of time can be involved in the forensic imaging and review of information.  This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs."  Fed. R. Crim. P. 41(e)(2)(B), cmt. to 2009 Amend.  The agents' actions here complied with the Federal Rules and were neither unconstitutional nor illegal.  Accordingly, his motion to suppress evidence seized from the Ryerson Avenue residence is denied.

**B.     Motion to Suppress Defendant's Statements**

Defendant also moves to suppress the statements he made to law enforcement on the day of the search.  He seeks to suppress: (1) the statement he made to law enforcement after he opened the door, telling them that they were there because of him; and (2) his statements in the basement in response to the agents' questioning.

1.   Defendant's First Statement Was Not Made in Response to Custodial Interrogation

A confession taken during a custodial interrogation without the provision of *Miranda* warnings violates the privilege against self incrimination.  *See Thompson*, 516 U.S. at 99 (1995). Custodial interrogation is questioning "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis*, 446 U.S. 291, 298 (1980) (quoting *Miranda*, 384 U.S. at 444 (1966)). "The ultimate inquiry is: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (citations omitted).   The inquiry is an objective one that asks whether a reasonable person would have felt free to leave.  *United States v. Vidal*, 85 Fed. Appx. 858, 861 (3d Cir. 2004). Interrogation occurs when a suspect is "subject to express questioning or its functional equivalent[,]" namely, "any words or actions on the part of police officer…that the police should

14

know are reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. The Defendant argues that his initial statement that the agents were there because of him was in response to custodial interrogation and should be suppressed.

Special Agent Fallon testified that when he entered the house, the Defendant asked him if he could see a copy of the warrant. At some point shortly thereafter, Agent Fallon observed the Defendant become upset while reading the warrant and he asked if the Defendant knew why the agents were there. At this point, the Defendant was not under arrest, although he was in the presence of law enforcement agents, and there is no indication that the agents were forceful with him or used coercive language. Moreover, the Defendant was in his home and not in a custodial environment.

In similar situations, Courts have found that this degree of restraint of movement is not sufficient to constitute custodial interrogation. *See, e.g., United States v. Vidal*, 85 Fed. Appx. 858, 861-862 (3d Cir. 2004) (finding that the defendant was not in custody because "none of the most obvious indicia of custody were present[:] [the defendant] was never formally arrested, frisked, told he could not stop the questioning, or told he could not leave. Furthermore, the interrogation took place in [the defendant's] home, not in a police station or other more intimidating location."). Notably, in *Vidal*, the Third Circuit found a lack of custody even when, after executing a search warrant at the defendant's home, agents questioned the defendant while sitting at his kitchen table. *Id.* at 860. As in the instant matter, the defendant in *Vidal* "was permitted to move about the house, although only if accompanied by an agent. He was [also] permitted to use the bathroom by himself, but with the door partially ajar…." *Id.*

"Where, as here, the individual has not been openly arrested when the statements are made, something must be said or done by the authorities, either in their manner of approach or in

15

the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (internal citations and quotations omitted). Because the Government has met its burden of proving that the Defendant's movements when agents entered the residence, handed him the warrant, and escorted him to the kitchen, were not seriously restricted to the extent required to be deemed "in custody," the Court finds that the Defendant was not in custody at that time, and thus denies the motion to suppress his first statement.

2. Defendant's Statements in Response to the Agents' Questioning Followed a Valid Miranda Waiver

Next, Defendant argues that the statements he made in response to Agents Fallon and Kret's questions in the basement should be suppressed because they were made involuntarily. The Government argues that the Defendant's statements were voluntary and made subsequent to a valid *Miranda* waiver. The Third Circuit has explained what it means for a statement to be made involuntarily:

> The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). These surrounding circumstances include "not only the crucial element of police coercion, *Connelly*, 479 U.S. at 167," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (some internal citations omitted).

*Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002). To introduce into evidence a suspect's statement made during custodial interrogation, the government must establish, by a preponderance of the evidence, a voluntary waiver of *Miranda* rights. *Connelly*, 479 U.S. at

168-69.  The Government points out that a statement following *Miranda* warnings will "rarely"
be deemed involuntary, *Dickerson v. United States*, 530 U.S. at 444, and that "an express written
waiver of *Miranda* rights is strong proof that a waiver is valid."  (Gov't. Opp. 22); *North
Carolina v. Butler*, 441 U.S. 369, 737 (1979).

Defendant has not demonstrated that his will was overborne to the degree necessary for a
finding of involuntariness.  In fact, according to the testimony of Agent Fallon, which the Court
finds credible in this regard, the Defendant himself suggested that the questioning take place in
the basement, and he was permitted to halt the questioning in order to use the restroom.  There is
no indication, considering the totality of the circumstances, that the Defendant's "will was
overborne in such a way as to render his confession the product of coercion." *Fulminante*, 499
U.S. at 288.

Defendant also argues that his statements were involuntary because he was given
*Miranda* warnings in "English as opposed to the language in which he is fluent[,]" Spanish, and
"there was no acknowledgement that he understood his rights."  (Def. Br. 24, 25-26.)  As a
result, Defendant maintains that he could not have knowingly and voluntarily waived his rights.
At the Court's evidentiary hearing on this issue, Special Agents Fallon, Vasquez, and Doyle
testified that their interactions with the Defendant on the day of the search lead them to believe
that he spoke, read, and understood English. Although the testimony of Special Agents Fallon
and Vasquez was inconsistent on a key issue, that is, whether Agent Vasquez administered the
third knock-and-announce, the Court finds their testimony to be credible on the issue of whether
the Defendant spoke and understood English.  Both agents testified that they observed the
Defendant reading the warrant, that the Defendant requested documents in English, as opposed
to Spanish, and that he said he did not need a translator.  In addition, Agent Fallon verbally

administered the *Miranda* warnings, and handed the Defendant the *Miranda* waiver form to read and sign.

Moreover, even if the Court were not to credit their testimony, the Court finds especially credible the testimony of Special Agent Doyle. Special Agent Doyle met with the Defendant the same morning of the search with the specific goal of gauging his intentions regarding immigration proceedings. In this regard, he had to determine whether the Defendant understood English and the Notice of Rights form. He read the form out loud to the Defendant, and had the Defendant read the form out loud to him. He testified that he typically tests a subject's English skills by having him read the form out because he needs to make sure that the subject understands the form and does not need a translator.

In light of Agent Doyle's testimony, as well as that of Agent Fallon and Agent Vasquez, the Court finds that the Defendant understood English to a degree sufficient to enable him to understand his rights and voluntarily, knowingly, and intentionally waive them. *See United States v. Donzo*, 2007 U.S. Dist. LEXIS 54522, at *21-22 (E.D.Pa. July 26, 2007) (finding valid waiver of *Miranda* rights where Government established that Defendant answered questions in, read, and understood English); *United States v. Espinosa*, 2008 U.S. Dist. LEXIS 104900, at *14-15 (E.D.Pa. Dec. 24, 2008) ("[E]ven in situations where administering Miranda rights in Spanish is preferable, there is no violation where the record indicates that a defendant "understood those rights as they were being read to him in English, and responded to all questions in English," thereby "demonstrat[ing] sufficient understanding of the English language for purposes of the interrogation.") (citing *United States v. Lugo*, 170 F.3d 996, 1004 (10th Cir. 1999)). Because the Government has met its burden of proving that the Defendant's statements

were made voluntarily, and that the *Miranda* waiver was proper, the Court denies the motion to suppress.

## IV.     CONCLUSION

For the foregoing reasons, Defendant's motion to suppress the evidence seized from the Ryerson Avenue residence and the statements he made to law enforcement agents on the day of the search is DENIED.

Dated: April 11, 2014

Jose L. Linares
United States District Judge

19